United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BACKWEB TECHNOLOGIES, LTD.,

    Plaintiff,

v.

HEWLETT-PACKARD COMPANY,

    Defendant.

_____/

No. C 10-4311 PJH

**ORDER CONSTRUING CLAIMS**

Plaintiff BackWeb Technologies, Ltd. ("BackWeb") asserts three patents against defendant Hewlett-Packard Company ("HP"). The patents at issue are U.S. Patent No. 5,913,040 ("the '040 patent"), U.S. Patent No. 6,317,789 B1 ("the '789 patent"), and U.S. Patent No. 6,539,429 B2 ("the '429 patent").

The patents involve technology that allows a computer to download large amounts of content and software (such as patches and updates) in the background, while the user simultaneously works online, without noticeable slow-downs.

The '789 patent (dated November 13, 2001) is a continuation of the '040 patent (dated June 15, 1999), and the '429 patent (dated March 25, 2003) is a continuation of the '789 patent.

The specification describes the object of the invention as follows:

> . . . to provide a process for transmitting an information file between a local computer and a remote computer network over a communications link with minimal interference to other processes executing on the computer which are also transmitting over the communications link.
> . . . to provide a method and system of presenting individualized advertisements and other informational messages on a computer by allowing

a user to select from a variety of advertisement or informational categories.

. . . to provide a method and system of downloading and presenting individualized advertisements and other informational messages from a remote network to a local computer based on a user's selection of advertisement or informational categories.

. . . to provide such a method and system of downloading and presenting individualized advertisements and other informational messages from a network to a local computer with minimal interference with other data being transmitted between the network and the local computer.

'040 Patent, 2:60-3:14.[1]

In their Joint Claim Construction Statement, filed July 1, 2011, the parties listed six terms as disputed:

1. "**line utilization rate**" and "**utilization**" in independent claim 7 of the '040 patent, and dependent claims 10-14 (which depend from claim 7); in independent claims 1, 7, 12, 17, 20, and 22 of the '789 patent, and dependent claim 2 (which depends from claim 1) and claim 15 (which depends from claim 12); and in independent claims 1 and 5 of the '429 patent; and "**usage**" in independent claim 19 of the '789 patent;

2. "**persistent memory**" in independent claims 7, 13, and 14 of the '040 patent; and in independent claim 22 of the '789 patent;

3. "**high[er] priority process**" in independent claims 1, 7, 12, and 17 of the '789 patent; and dependent claim 2 (which depends from claim 1);

4. "**calibrating/calculating [the amount of data to be sent]**" in independent claim 7 of the '040 patent; and in independent claim 12 of the '789 patent;

5. "**tracking information**" in independent claims 7, 13, and 14 of the '040 patent; in independent claims 19, 20, and 22 of the '789 patent; and in independent claims 1 and 5 of the '429 patent; and

6. **[primary/secondary]** "**logical communications link**" in independent claims 1 and 5 of the '429 patent.

---

[1] The specification is the same for all three patents, and, as agreed by the parties, all citations to the shared specifications of the three patents are made to the '040 patent, unless otherwise indicated.

In the Amended Joint Claim Construction and Prehearing Statement, filed September 23, 2011, the parties listed the same six disputed terms, but noted that they had stipulated to a construction for the second term listed above – "persistent memory" – had also stipulated to a construction for "calibrating" in the fourth term, above, but not for "calculating" or "amount of data to be sent."

The court heard argument regarding the constructions of the disputed claim terms on September 28, 2011. At the hearing, the parties agreed to further meet and confer in an attempt to resolve their differences. On October 14, 2011, the parties submitted a joint letter regarding proposed claim construction compromises.

## DISCUSSION

A.  Legal Standard

Patent infringement analysis involves a two-step process. The court must first determine as a matter of law the correct scope and meaning of disputed claim terms, and must then compare the properly construed claims to the accused device to see whether the device contains all the limitations (literally or by equivalents) in the claims at issue. Markman v. Westview Instruments, Inc., 517 U.S. 370, 384 (1996).

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citation and quotation omitted). The court must determine the meaning of disputed claim terms from the perspective of one of ordinary skill in the pertinent art at the time the patent was filed. Chamberlain Group, Inc. v. Lear Corp., 516 F.3d 1331, 1335 (Fed. Cir. 2008).

A patentee is presumed to have intended the ordinary meaning of a claim term in the absence of an express intent to the contrary. See York Prods., Inc. v. Central Tractor Farm & Family Ctr., 99 F.3d 1568, 1572 (Fed. Cir. 1996). The ordinary and customary meaning of a claim term is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Phillips, 415 F.3d at 1313.

The person of ordinary skill in the art is "deemed to read the claim term not only in the context of the particular claim . . . but in the context of the entire patent, including the

specification." Id. Indeed, a patent's specification "is always highly relevant to the claim construction analysis" and claims "must be read in view of the specification, of which they are a part." Id. at 1312-15 (citations and quotations omitted). Because the specification must contain a description of the invention that is clear and complete enough to enable those of ordinary skill in the art to make and use it, the specification is therefore "always highly relevant" to the court's claim construction analysis. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

In some cases, the specification may reveal that the patentee has given a special definition to a claim term that differs from its ordinary meaning; in such cases, "the inventor's lexicography controls." Phillips, 415 F.3d at 1316. The specification also may reveal the patentee's intentional disclaimer or disavowal of claim scope. "In that instance, as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." Id. Although the court must read the claim in view of the specification, the claims are not limited to preferred embodiments or illustrative examples appearing in the specification. Kraft Foods, Inc. v. International Trading Co., 203 F.3d 1362, 1366 (Fed. Cir. 2000).

The words in the claim may also be interpreted in light of the prosecution history, if in evidence. Teleflex, Inc. v. Ficosa North Am. Corp., 299 F. 3d 1313, 1324-25 (Fed. Cir. 2002) (citations omitted). The prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Phillips, 415 F.3d at 1317.

Finally, after reviewing the intrinsic evidence, if the court is unable to resolve a disputed claim term, it may consider extrinsic evidence, such as expert testimony, inventor testimony, and technical treatises and articles. Vitronics, 90 F.3d at 1584. However, while courts have discretion to consider extrinsic evidence, such evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." Phillips, 415 F.3d at 1317–18 (internal quotations omitted).

4

B.  Construction of the Disputed Terms

    1.    "**communication line utilization rate**" and "**utilization**" ('040 patent; '789 patent; 429 patent); "**usage**" ('789 patent)

In the parties' Joint Claim Construction Statement, BackWeb proposed the construction "the rate at which a communication line is being used, measured as either a percentage of total possible use or by data throughput across the IP connection per unit of time as, for example, in bytes/second;" and HP proposed the construction "percentage of time that the communications line is busy."

Following the hearing, during the parties' meet-and-confer, BackWeb proposed the following compromise: "the rate at which a communication line is being used." HP countered with "the rate at which a communication line is being used measured as a percentage of total use." When BackWeb was unwilling to accept HP's counter-proposal, HP retreated to its initial position: "percentage of time that the communication line is busy."

Thus, the parties' dispute concerns whether the appropriate measurement of the "utilization" or "usage" of the communications line is the "rate at which the communication line is being used," or whether it must be limited to the "percentage of time the communication line is busy." The court finds that BackWeb's proposed construction is more closely supported by the language of the claims and the specification.

As an example, claim 7 of the '040 patent recites "a process for transmitting a file of data between a client computer and a server computer, coupled by a communications link on a computer network." This process comprises certain steps, including:

    (a) monitoring the <u>communication line utilization rate</u> for said communications link;

    (b) comparing said <u>communication line utilization</u> to preestablished values;

    (c) calibrating the amount of data to be transmitted based on said comparison of said <u>communication line utilization</u> to said preestablished values;

    (d) transmitting said calibrated amount of data;

    (e) tracking the remaining untransmitted portion of said file, said tracking providing tracking information for any remaining untransmitted portion of the file;

5

>(f) storing said tracking information indicating the last transmitted portion of said file, said tracking information being stored in persistent memory; and

repeating these steps until the file has been transferred.  '040 patent, 17:31-54.

The language of the claims does not limit the method of determining the rate at which the communication line is being utilized to the "percentage of time" that the line is busy.  The claims simply require that the rate of utilization be monitored and compared to preestablished values, and the amount of data that can be transmitted will be based on a comparison of that utilization to the preestablished values.

Both claims 1 and 5 of the '789 patent recite that the communication line utilization rate is a function of the rate of data transfer, not the percentage of time the communication line is busy.  For example, claim 1 of the '789 patent recites "a method for transmitting data between a computer and a computer network coupled by a communications link," which method comprises steps including "(a) determining a current communications line utilization rate for the IP connection until the current communication line utilization rate is below a line utilization threshold . . . , said communication line utilization rate being a function of the rate of data being transferred in at least one direction across said IP connection."  '789 patent, 15:61-16:14.  Because the same claim term is used in a family of patents, the construction of this term must be broad enough to include its use in all three patents.

Claims 7, 12, 15, and 17 of the '789 patent all recite "a process for transmitting data between a client computer and a server computer coupled by a communications link," comprising certain steps including, for example, "determining a current line utilization rate" (claim 7), or "calculat[ing] a current communications link utilization rate for said communications link" (claim 12), or "monitoring data . . . to determine a communication line utilization rate for said communications link" (claim 17).  '789 patent, 17:1-10; 18:1-11, 18:34-41.

"In light of the statutory directive that the inventor provide a 'full' and 'exact' description of the claimed invention, the specification necessarily informs the proper construction of the claims."  Phillips, 415 F.3d at 1316.  Here, the specification indicates

6

1  that communication line/link "utilization" or "usage rate" refers to a measurement of the
2  available bandwidth of a communication line by the software applications or processes that
3  are sending or receiving data across that communication line.  When such utilization of the
4  line is low – i.e., not unacceptably "busy" – the claimed process of the patents permits the
5  transfer of data at a rate appropriate to the level of utilization.

> The system incorporates a type of intelligent software agent technology referred to herein as a "Polite Agent."  The role of the Polite Agent is to perform communication tasks in the background without imposing a noticeable overhead on the user. . . . The TCP/IP Polite Agent 280 transmits information during periods of low line utilization without causing a noticeable slowdown in the data transfer rate of other processes communicating over the Communications Link 703.  The TCP/IP Polite Agent 280 constantly monitors communications status and determines periods of low communication line utilization.  It then uses the TCP/IP communications resources, available on the platform, to transfer a portion of the data.

'040 Patent 13:5-17; see also id. 3:54-58 (when the utilization rate is low, "[t]he Polite Agent monitors the communication link between the network and the local computer and transfers small portions of the information"); id. 7:58-61 ("The TCP/IP Polite Agent 280 is responsible for monitoring the communication line utilization rate and transmitting data during times of low communications line utilization").  When, on the other hand, the line utilization "becomes high due to other applications executing on the Local Computer," the claimed system "temporarily suspends its data transfer operation until ample resources are available once again." Id. 13:23-30.

Thus, both the specification and the claims indicate that the means by which the "communication line utilization rate" may be measured varies.  It may be expressed in terms of "percentage of time" that the line is busy, see id. 13:35-38; and it may also be expressed as "a function of the rate of data being transferred in at least one direction" across a computer network, such as in bytes per second, see '789 Patent, claims 1, 5.

HP's proposed construction, which limits the measurement of the "utilization" or "usage" rate to the "percentage of time that the communication line is busy" is also at odds with the disclosure of the preferred embodiment, which describes measurement of the communication line utilization rate in terms of bytes per second being transferred:

7

> In the preferred embodiment of the invention, the target operating system will be Microsoft Windows-95 utilizing a TCP/IP protocol. Extension of these operations for different protocols or operating systems will be apparent to those of ordinary skill in the art. . . . In step C [of the TCP/IP Polite Agent Process] . . . the current communication line utilization is obtained. <u>For TCP/IP under Windows-95, statistical information regarding the communication line utilization is available from the operating system, including such information as bytes/second.</u> In the preferred embodiment, this sampling does not impose a significant overhead on the system and therefore does not cause any noticeable degradation of foreground processes.

'040 Patent 13:51-55, 14:8-15 (emphasis added).

Because HP's proposed construction appears to read out the embodiments described in the specification – <u>i.e.</u>, it describes a measurement of "percentage of time" that the line is busy, and does not allow for a measurement of number of bytes (or other units) being transferred – it is disfavored. See <u>MBO Labs, Inc. v. Breton, Dickinson & Co.</u>, 474 F.3d 1323, 1333 (Fed. Cir. 2007); <u>Primos, Inc. v. Hunter's Specialties, Inc.</u>, 451 F.3d 841, 848 (Fed. Cir. 2006).

Finally, statements made by the applicants during the prosecution demonstrate that the term encompasses more than one mechanism to express the line utilization rate. For example, the applicants explained that "[t]he claimed process monitors the 'communication line utilization rate' as a feed back mechanism for determining when to transmit data," and that "[t]he communication line utilization 'rate' is a function of the percentage of the time that the communication line is busy." See '040 patent, October 30, 1997 Response to Office Action, at 17. In addition, however, when contrasting the prior art in the same Response to Office Action, the applicants described the "communication line utilization rate" as a function of the rate of data transmission – not just as a measurement of percentage of time busy. See <u>id.</u> at 18. And less than a year later, the patentees stated that "[t]he claimed process monitors the 'communication line utilization rate' which is a function of the rate of data being transferred across the IP connection." '040 Patent, August 18, 1998 Amendment, at 15.

Accordingly, "**communication line utilization rate**" or "**usage rate**" means "**the rate at which a communication line is being used**."

1      2.    "**persistent memory**" ('040 patent; '789 patent)

2      Prior to the September 28, 2011 hearing, the parties stipulated to BackWeb's proposed construction, as follows: "storage medium for computer data that retains the stored data even when disconnected from a power source."

5      Accordingly, "**persistent memory**" means "**storage medium for computer data that retains the stored data even when disconnected from a power source**."

7      3.    "**high[er] priority process**" ('789 patent)

8      BackWeb initially proposed the following construction: plain meaning of "high[er] priority process" and plain meaning of "prioritizing." Defendants initially proposed the following construction: "user-specified preferred process."

11     In their briefs and at the September 28, 2011 hearing, the parties focused on whether "higher priority process" means "preferred process," or whether it should be accorded its plain meaning. That dispute has been resolved, as both sides agree that "higher priority process" means "preferred process." Both sides also agree that the "preferred process" is "user-specified."

16     The sole remaining dispute, as set forth in the October 14, 2011 joint letter, is whether the "user" that specifies the process can be the "end user," the "system administrator," or some "other person" (BackWeb's position), or whether the "user" can only be the "end user" (HP's position).

20     The patents nowhere define the word "user," but the court understands it to refer generally to the person who "uses" the computer. The specification includes numerous references to the "user" configuring the system, or entering his/her preferences (mostly as to the display and content of the advertisements, or the category of advertisements). See, e.g., '040 patent, 2:66-3:8; 3:27-39; 3:44-51; 9:34-41, 9:63-10:8. In particular, the specification ("User Interface Setup") contemplates allowing the "user" to input and view preferences as to "advertising categories" and also as to "local computer configuration data." Id. 9:17-20.

28     The court finds no indication in the patent that "user" is to be limited to "end user," or,

9

1 conversely that it must include other specific categories of "users," such as "system
2 administrator" or "other person." Because an "end user," a "system administrator" and an
3 "other person [who uses a computer]" all fall under the category "user," the court finds no
4 reason to construe this term.

5 Accordingly, "**high[er] priority process**" means "**user-specified preferred**
6 **process**."

7     4.   "**calibrating/calculating**" [**the amount of data to be transmitted**] ('040
8 patent; '789 patent)

9 Prior to the September 28, 2011 hearing, the parties agreed that the term
10 "calibrating" means "adjusting." At the September 28, 2011 hearing, the parties agreed that
11 "calculating" means "determine" or "determine mathematically," and that "the amount of
12 data to be transmitted" should be given its plain and ordinary meaning.

13 Accordingly, "**calibrating**" means "**adjusting;**" "**calculating**" means "**determining**"
14 or "**determining mathematically.**"

15     5.   "**tracking information**" ('040 patent; '789 patent; '429 patent)

16 BackWeb initially proposed that "tracking information" be given its plain meaning,
17 and HP proposed the construction "information indicating the amount of data remaining for
18 transmission."

19 At the hearing, the parties appeared to agree that "tracking" means "following" or
20 "monitoring," and that "information" refers to details regarding an amount of data. In the
21 October 14, 2011 joint letter, BackWeb proposed, as a compromise, that the term "tracking
22 information" be construed as "information regarding the progress of a data transfer."
23 However, HP maintains its original position. Thus, the dispute appears to concern the
24 construction of "tracking" as part of the phrase "tracking information."

25 BackWeb asserts that it is not necessary to construe this term, but that in any event,
26 the tracking information is simply information about the process or progress of the data
27 transfer, regardless of whether it involves the last remaining portion of the data to be
28 transferred, or the first portion that has already been transferred. HP contends that anytime

10

"tracking information" is used in the patent, the information that is "tracked" is information regarding the amount of data that remains for transmission (the remaining untransmitted portion of the data).

As an example, claim 14 of the '040 patent describes a "process for transmitting a file" between the server computer and the local computer, and lists the steps in the process. The first step is "monitoring the communications link to determine if the communication link coupling the local computer and server computer has been established." The second step is "determining a communication line utilization rate for the communications link." '040 patent, 18:39-47.

If the communications link has been established, the third step is "transmitting a portion of data from the remaining file between the network and the local computer." In that step, the amount of data in that "portion of data" that is being transmitted is "a function of [the] communication line utilization rate." The fourth step is "tracking the remaining untransmitted portion of the file," and that "tracking" provides "tracking information for any remaining untransmitted portion of the file." The fifth step is "storing [the] tracking information indicating the last transmitted portion of [the] file." That "tracking information" is "stored in persistent memory." Id., 18:48-59.

In this example, "tracking" means "keeping track of," or "making a record of," the information that has not yet been transmitted. That "tracking" provides "tracking information for any remaining untransmitted portion of the file," and the "tracking information" which indicates the last transmitted portion of the file will be stored in "persistent memory."

Similarly, claims 1 and 4 of the '040 patent, and claims 1, 6, and 19 of the '789 patent all recite "tracking a remaining untransmitted portion" of, either the "file," or the "information item," or the "data," or the "advertisement item," and most add, "said tracking providing tracking information" for the untransmitted portion. Thus, the construction proposed by HP appropriately refers to the data remaining for transmission.

The prosecution history also supports HP's proposed construction. In an Office Action dated February 4, 1988, the examiner distinguished the Tuch prior art reference on

the basis that it did not include the claimed tracking because "Tuch . . . does not explicitly show that the remaining untransmitted portion of the information is tracked." That is, the examiner read the patents to specifically require that tracking include the remaining untransmitted portion of the data. Later, the patentees amended all of the claims with "tracking" to clarify that "said tracking provides tracking information for any remaining untransmitted portion" of the data or whatever.

Accordingly, the court finds that "**tracking information**" means "**information indicating the amount of data remaining for transmission**."

6.   [**primary/secondary**] "**logical communications link**" ('429 patent)

BackWeb proposes the following construction: "connections between pairs of specific end points on a network established above the physical network layer." HP asserts that this term is indefinite under 35 U.S.C. § 112 ¶ 2.

Under 35 U.S.C. § 112 ¶ 2, "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. This ensures that the claims "delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude." Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347 (Fed. Cir. 2005).

If a claim is not sufficiently definite to inform the public of the bounds of the protected invention, competitors will be unable to avoid infringement. Halliburton Energy Services, Inc. v. M-I LLC, 514 F.3d 1244, 1249 (Fed. Cir. 2008). Thus, in order to prove indefiniteness, the accused infringer must show by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history. Id. at 1249–50.

Because an indefinite term may be impossible to construe, courts sometimes decide definiteness issues during claim construction. Here, however, the court finds that the question whether this term is indefinite should be addressed as part of HP's single motion for summary judgment.

Accordingly, the court defers ruling on the construction of this term.  If the court ultimately determines that the term is not indefinite, it will reconsider the issue at that time.

## CONCLUSION

In accordance with the foregoing, the court finds as follows:

1. "**Communication line utilization rate**" or "**usage rate**" means "**the rate at which a communication line is being used**."

2. "**Persistent memory**" means "**storage medium for computer data that retains the stored data even when disconnected from a power source**."

3. "**High[er] priority process**" means "**user-specified preferred process**."

4. "**Calibrating**" means "**adjusting;**" "**calculating**" means "**determining**" or "**determining mathematically.**"

5. "**Tracking information**" means "**information indicating the amount of data remaining for transmission**."

6. The court defers ruling on the construction of [**primary/secondary**] "**logical communications link**," pending a determination whether it is indefinite.

**IT IS SO ORDERED.**

Dated:  December 20, 2011

_____
PHYLLIS J. HAMILTON
United States District Judge

13